Good morning. You may proceed. As a matter of fact, I'm going to be talking about this on Sunday, but I would like to take this opportunity to address two points. First of all, in the discussion of whether or not this is a discretionary decision whether the Navy has any discretion in this matter, whether it's a purely residential decision. The second point to address is, and I believe to address it more directly, is the discussion of whether or not any consequences are at play. I'm talking about the issue of overspecification of the US Navy and the CIS. In this case, what we're asking the court to do here is to demand this case to the Navy for preparation of environmental impact data that will discuss the environmental consequences of an accidental detonation of a Trident II or Trident V missile. That's a nuclear missile that was recently brought to a submarine-based bank earlier. This case is not about nuclear disclosure. It's not about nuclear war. It's not about the question of whether or not you can have a nuclear arsenal located anywhere. The question is about the missile itself, the DeFry rocket motor, and its ability to explode, and what an explosion like that would mean to the habitat, to the wildlife, and the people of this country. The points I want to address, again, primarily, let's start by talking about the Navy's primary argument that this is a decision made by the President and that the Navy has no discretion. If we review the Navy's brief, it would take about an inch and a half to twist our argument, twist our case into, as they say, an argument that we are really challenging whether or not the Trident system should exist. But that's not, again, where our case is at. Our complaint, I agree with you, is clear to you that the issue here is only about the handling of the G-5 missiles and whether or not the handling of those missiles will result in an impact. And that is, in our view, there's no evidence that the Navy can't have a Trident submarine and not move the missiles around the stand, or that they have to move them all year round. The case, BFG versus the Department of the Public Citizen, the Department of the Public Citizen, resolves, it's been a long time since we've worked together, but it resolves the question. And I really want to say this question. If there's no discretion for the agency to act on it, then there's no need to document environmental impacts. In that case, what we had was an argument was made that by allowing Mexican trucks to come into the U.S., those Mexican trucks were going to add air pollution and do environmental impacts. And we wanted the Department of Transportation to document those environmental impacts. But the resolution of the case is that the President had decided, and actually through NAPA, that those trucks were coming in, although he wasn't sure. The Department of Transportation didn't have any authority or any control over the number of trucks. They didn't have any authority to impose air pollution, to change those air pollution requirements. So there's nothing that the Department of Transportation could have done based on this environmental review. So therefore, again, NAPA doesn't apply. But in this case, what we have is that the Department of the Community operates under its own rules and regulations, including the Department of Transportation. One of those directives, which we've discussed in our briefing, requires the agency to address the safety of its missile operations and to ensure the maximum possible protection for the people, the facilities on the base, and the living environment. So here, the Navy has absolute authority, actually is required, to deal with environmental protection as well as personnel and facility protection in its operations. There's nothing to say that the Navy cannot decide that, based on environmental review, based on environmental protection, based on what it might learn through environmental impact studies, that they shouldn't load these missiles, or they shouldn't load or non-load these missiles, and retire the submarines, but we cannot watch them. We already know that the blast zone is the Navy's capital, it's the safety and distance partner that the Navy uses. It reaches all the way across the canal. So it's not just the base, it's all the way across the canal. But the Navy has never documented what that means. Just to go back, it seems to me we have to figure out this threshold jurisdictional issue as to whether you're challenging a presidential decision or an agency decision. So am I correct that you're not challenging the existence of these missiles at Bangor, but rather once they're there, how, or to what extent, you know, how they're dealt with on a safety basis? How they're dealt with, the question we're looking at is, I can't find enough of these missiles to pose a risk. Right. But there's a load. The risk is the Navy documents and the Navy plans for itself. The Navy has to do what it should do. They have to load and they have to non-load them. Do they need to do that at Bangor? When you say do they need to do that at Bangor, what if the president said, I want these missiles need to be at these three bases, you know, two on the East Coast and one here in the Puget Sound. Then the president says, I want, you know, full alert missiles at these three bases, given the state of the situation. Can you challenge that? Can I challenge that? Probably not. Okay. So then you're saying, though, whether these missiles should even be at Bangor. I thought you said you were challenging that. No, we're not. Okay. We're challenging how they are handled at Bangor. So you have to say, assume the missiles are, well, they are at Bangor. Missiles are at Bangor, and we're not saying they can't be there because we don't have authority to challenge that. We're simply saying now that they're there, how should they be handled? How should they be handled? What time of year should they be handled? For example, in the record dealing with the native species questions in Klamath yesterday, there's a discussion of the need to fund warfare repairs. In some of the restrictions imposed on us, you can't do those warfare repairs over the water when the threatened salmon populations are migrating to the canal. But there's a time limitation placed on the native species, on when it can do that, when it can do certain operations. Does the record tell us whether these missiles are loaded and unloaded at the base here on Hood Canal or whether they're just operations handling them on the subs and they're loaded some other part of the country? In other words, does the record tell us what's done in terms of the physical movement of these missiles? The record tells us generically how the missiles are loaded and unloaded. There's a declaration in the 80s, discussing the loading and unloading. Does the record say if that occurs, if loading occurs at the base? At the time this case was submitted, the message was not to get that angle. So no, that's not true. So let's just say hypothetically, if they loaded the missiles on the sub in Providence, Rhode Island, and then they took the sub across through whatever route they have to go, and up here, and they get into Hood Canal, and they go to this base, would you still have the same issues about the handling of the missiles? If the missiles are not loaded and unloaded at this base, no. You wouldn't have issues about what they do on the sub with the missiles? As long as they're not moving these things around, taking them out of the sub, putting them back in the sub. That's what this case is about. Okay, so it's just about, okay. If they suddenly pass through this port, or come into this port, and these missiles are not handled, then that's not, that's not good. Well, within the restrictions of what we can know within the nuclear thing and whatever, what's the purpose then of Bangor? In other words, we're kind of, I'm a little bit going along with what's been asked here. I'm not too sure I understand what Bangor is, other than the fact that some place to leave somebody off to stretch their legs. In other words, if there are missiles on the shoreline, because it talks about a large acreage, and if either they're the first edition or the second missiles, and if they're sitting on the shore, and they're there in case they have to replace one, or whether they change them out, or whether they inspect them, or what if, do the submarines stay there? Do they stay on the dock? And if they stay on the dock, and the missiles are in the submarine, are you worried that they'll blow up in the submarine? I'm not even sure. If it's just handling, then we're, you seem to answer the question of handling, but I'm not too sure I really understand what's going on here. What we know is that the risk that we've got is not identified here. It is from the handling. And that's the risk with me, because I've got a body drawn to close to my arms. That they could blow up. That they can blow up during the handling. That there's a detonation. We would not like that. We would not like a nuclear explosion. Let me be very clear on that. No, it's the motor. The motor explodes. Just like a, just like a, we're talking about a propellant explosion, and what that can mean during a loading anomaly. And the Navy's the one that's calculating the arc based on that potential. The Navy's the one that decides the potential. The Navy's the entity that in 1999, we know spent about $470,000 to build new facilities to get them out at that time. Yeah, but within the NEPA structure, then, doesn't that throw us into the risk calculations, the FONSI, and the rest of it? Now, I understand what you want, and I understand exactly what you're saying, but what went wrong here other than the fact that you want something more? Didn't they satisfy it with their risk study? No, they did not. Because their risk study looks only at building locations on the base. They've gone farther. No, but it's, see, this is where I go back to number one, is if we have a missile. Now, whether the missile is in the boat or on the shore and stopped, there's no hand problem. Now, when I start handling it, it's still the missile. And so whether the arc, if the arc isn't right, in other words, if they're going to load from one mile away or five miles away, I can understand saying, well, the arc is wrong. But if they've constructed the proper arc for any possible loading circumstance, and then if they've said, no matter what we do, no matter how we handle this missile, the risk is, I don't know, 1 in 100 million or whatever, if that's done, what's the problem? I'm trying to go to the next step. Okay. The next step is, what they have done is document the environmental impact statistics. But doesn't the risk trump that and get them to the FONSI? No. Tell me why. Well, they haven't done a FONSI. They haven't done that analysis. They haven't decided, made that determination. Didn't they make a FONSI earlier? There was an old EIS. An old EIS. Right. There's a very old EIS, 1976. Before they constructed D-5. Certainly before D-5. The predecessor missile, right? The predecessor missile. They discussed it. There might be a D-5 one of these days. But it doesn't exist yet. That was in 1976. But then they went back and piggybacked on that, right? They piggybacked on it. But they never addressed, and again, coming down to this, never addressed what happens to the environment, what happens to migrating sand if this thing. No, I understand it completely. What I can't understand is the linkage. For instance, let's assume that by some miracle, which is not possible, obviously, someone came up with a study and said, there's no way this will ever explode under any circumstances. Then what's the difference? Because if that's accepted as a given, then the logic tells you you can't have an environmental problem. Now, when they come up with the risk study that it says one in so many million chances, does that at any time eliminate the need underneath that to do then an environmental study? In this case, at any time, there may be an impact. I don't know what that impact is at this point, though. Okay, why is it short of that end point in this case? Because the Navy itself, it must be a high enough risk here that the Navy is still planning for it. This is not the case where the Navy has said, I'm sorry, but Catch-22, if I plan for it, it's too high, and if I find that it's very high and it won't happen, I'm still planning for it, so there must be a problem. The Navy has decided it's going to plan for this risk. Whatever the size of the risk is in this case, the Navy has decided it's going to plan for it. What's missing in the Navy's analysis is that the Navy was required to look at the environmental impacts of that, and they haven't. Okay. They both have personnel. I got you. You're saying the risk is, even if it's slim, it's high enough that they plan for it, and although they plan for the risk, they don't assess the environmental impacts of the occurrence. Right. And where that makes a difference, where it makes a fundamental difference here is, for example, the example I raised earlier, it's on timing. Maybe the decision that the Navy makes is that there are certain times of the year they should not be looking, I don't know if the business is over, but no. Because the salmon are there. Because the salmon are there. Okay. One thing that seems to have been critical in this determination is this timing. You know, at first blush, having a 10-plus-year-old EIS to rely on doesn't seem that it would pass kind of a smell test. But if within that EIS and environmental assessment, the back-fit program is sort of a smaller entity, they say it was downsized, and so therefore, in a way, it kind of fits within the umbrella, so therefore, we don't have to take it further, although we did look at these two new salmon species. Why isn't that enough to satisfy their look at the environmental impact? Because it still can never address what happened. This explosion of the calculate, the circling of that, it can never address what that means for the species around that. I mean, for example, if you raise it to, I don't know if you can do that, it's a bit of a wrong case. Again, it's a little more convenient to speak to this question. The next time it sticks, when we do the original EIS, the waters are teeming with salmon. That's the statement. It's kind of a grand statement that the waters are teeming with salmon. That's not true. So what does this mean now? If we're going to have this explosion occur over the amount of water, what does it mean to those salmon populations? That still has never been addressed. What does it mean to the human population outside of that area, just outside of the base? Is it nothing? We don't know. Maybe it's never addressed what it means to us. You can't just draw a circle and move the facilities out of its circle, its own facilities, and not address what it means to the presence of society, to the rest of the habitat in that specific region. That's what we need to explore. And again, coming back, I want to bring this back, because there's three more things to do. The first one is to inform the agency about what it's doing, so that the agency has a full consideration of the environmental impact, and you have a true health experience. We believe that the Department of Defense's record could tell the Navy to provide maximum protection to the environment. The Navy has a tool to give the Navy that information. The Navy has to look at that information. Do you want to save your remaining time for rebuttal? I'll make one point, and then I'll save at least a minute. The second purpose laid out in the Supreme Court is to inform the broader public and those that are concerned with the agency action about what is occurring due to the Navy's decision. In this case, the broader public involved include those that live here, the elected officials that decide on this program, and talk on this program, to keep this agency operating, and we'll get this going to load and unload. All those people need to be informed, and that's the purpose. Anything in that has not been met. And I'll save my last one minute. Thank you. Thank you. Good morning. May it please the Court. Kate Kovacs on behalf of the United States. NEMA simply doesn't apply to the claims that the plaintiffs are making here. In this case, and there are two claims in the gathering, and three on appeal, what we're seeking is an order enjoining basically all activity related to the D-5 missile at Bangor. Following the negotiation of the START treaties and an extensive nuclear posture review, the President issued Presidential Decision Document Number 30. In that document, he basically ordered the Navy to house the D-5 missile system at Bangor, Washington. And what that necessarily includes is loading and unloading missiles at Bangor. Now, I don't have an affidavit that says the Navy necessarily has to load and unload because it wasn't sort of the first time it's become clear. It didn't exactly what they wanted me to have somebody say in that day. But the record does make it clear that that's what it means to house the missile system at Bangor. What they do is they take the missiles off of the sub to do maintenance on the missiles to keep them as safe as possible. I refer the Court in particular to pages 10 and 155 of the excerpt. And I also think the D.C. Circuit's decision in the concern about Schreiber's case is particularly helpful. It gives a lot of background. That was the case in which the 1974 EIS was challenged. Now, of course, the Navy anticipated this upgrade. It planned for it for many years. But following PDD 30, which we have available at the Court's convenience for a camera review, following PDD 30, the Navy no longer has the discretion or the authority to not handle the D-5 missile at Bangor. When you say PDD, that's the executive order? That's the presidential decision document. So presidents come up with their own little names. Presidential decision document. Yes. But the plaintiffs can't see that because it's classified. That's correct. Your honors are obviously covered. So we have the document available for a camera review. We understand that and appreciate it. And if we decide that we want to look at it, then we'll invoke the process, which we have done before in other cases. Of course. But is the Navy's position that the presidential directive is of a sufficient program or a part of it be at this Trident Base on Hoot Canal? Yes. I stand 100% behind what we said in brief. Right. Okay. But they're not challenging. I mean, let's say the missiles are here. They can't challenge that. Right. And the president said they're supposed to be here. But does the Navy have the authority, then, as an agency, to determine how the missiles are handled once they are at the missile base? Sure. The Navy can control how they are handled. And it, of course, obviously absolutely maximizes the safety of the missile. Okay. So that's my question. Right. And they have to handle them that manner. And that's what the plaintiffs are talking about. Let's just stop. Okay. So the president says put these things there, and they can't challenge that. And, of course, if you put them there, by implication, you have to be able to use them, I guess, you know. So there's got to be some activity or handling with respect to making them functional, I guess. But if you go down another level, exactly, I, without looking at it, I mean, the presidential directive doesn't say, you know, don't do it in the fall because it rains too much on the Hood Canal, or don't do it upside down because then they might blow up, or that really is an agency action of the Navy to figure out how to make sure that once these missiles are here, they're safe, correct? Correct. So why couldn't, on that level, which I don't know if you call it the handling, but the implementation of the president's directive, why couldn't they challenge that under the APA? Well, there are several responses here, Your Honor. First of all, it's important to note that a lot of these sorts of details are classified, and so they wouldn't be subject to public opinion. The other point is that in the Mexican trust decision out of the Supreme Court on Monday, the agency there did have some discretion over the process of admitting Mexican trusts to the United States. This was already in our regulations for how the trusts would be admitted. The agency there even had some discretion over some elements of it, but they didn't have discretion over the ultimate decision of whether the trusts would be admitted to the United States. I think that's on all fours here. And the Supreme Court there held that in a situation like this, where the agency doesn't have any authority over the ultimate decision, the rule of reason doesn't require the agency to do the analysis. Are you trying to say – I read through your briefs. I'm listening to your argument. Are you trying to say that the nature of missiles with rocket motors that can explode and may or may not have nuclear warheads, which we can't know about because that's classified. And I assume if you go into the operation of a Trident submarine, you get to a point where some more stuff is classified, which might even go into when you take them off and when you don't take them off and how soon you need them and how times are ready. Are you saying we're getting so deep into the classified that it overarches any handling issues? So, therefore, there is nothing we can look at. Well, there's probably some. I don't know exactly what parts of the system are classified and what aren't. What I'm saying is if the Court were to order the Navy to do this analysis, much of it would be classified and would not be public. Well, okay, so then why is it not then a little opening here that there should have been an EIS or something done on that area, whatever it is, and that until we got into the process we wouldn't know? So why is the process not necessary underneath that? Well, there's two reasons. One, I would say, because ultimately the agency doesn't, again, the agency here maximizes the safety of the system. Well, are we going into the prior discussion I had about the risk area? Well, and that's the alternative. The alternative argument that the independent and alternative round of the Court can use to affirm the Court's judgment is that the risk of an accidental explosion is so remote that NEPA simply doesn't require the analysis. And, again, if you look at the statement of issues in the opening brief, it's clear in the argument here today. The sole concern in this case is the potential impacts of an accidental explosion. And we have, you know, this is where this sort of a one in a million kind of brought that maxim at least onto the page here. But then ground zero says we have some alternative calculations for how we calculate these. Do we give deference to the Navy in its one in a million calculation in determining whether a NEPA analysis is required, or does that in and of itself require some kind of permission for ground zero to challenge the one in a million? You see what I'm saying? It's like a pre-threshold issue. Right. I think both. The Court would, of course, defer to the agency's expert determination on this. Absent something arbitrary and capricious about it. Exactly. But in this case, the offense is uncontroverted. The district court held that it was uncontroverted. The only thing that's in the record is an affidavit from their expert saying he found the Navy's numbers to be unbelievable. Unbelievable. That's it. Following the Drell report, I think it's probably worth explaining where these numbers come from and exactly what they are. Congress had a panel headed by Dr. Drell. They issued a Drell report in 1990 that was concerned with nuclear weapon safety. And they expressed a concern in the report about the potential for plutonium dispersal in the case of an accident. Following that report, the Navy embarked on a four-year, $15 million study to determine exactly what the risk would be of an accidental explosion. And what the study determined, and we have affidavits from the man who headed the study in the record for Dr. Drell, what the study determined was that the potential for an accidental current in the Hamlin, the unloaded and unloaded, which is the most difficult thing to do with a missile, the potential for an accidental current is one in a million. And as you get the risk of a detonation, you have to multiply that one in a million out by the risk of the detonation, which for a first- or third-stage rocket motor is one in a trillion, and for the second-stage rocket motor is one in a hundred million. So the actual risk of the detonation that the plaintiffs are concerned about is one times ten to the negative 20 or something. It's extremely, extremely remote. You're saying it's one in a million there would be an accident? Yes. And then the odds that there would be a detonation in the accident would be still one in some very huge number. Precisely. So we're getting up towards a Google or something, not quite a Google, but a very large number, too large to comprehend. So then it wouldn't matter whether the circle you're looking at is the base circle or the broader circle because the accident itself is two levels remotely removed? Precisely. And that's what Brockmore is talking about in his declaration. He says that the study then, assuming that an accident occurs, the risk of the detonation, assuming means you have to multiply the risk of the accident by the risk of the detonation. Where is that in the record? Where is that data in the record? The name of the individual, please. I'm sorry? What's the name of the individual? Leroy Brockmore. Eljo Leroy Brockmore. There's two affidavits from Brockmore in the record. One is at 116 of the supplemental excerpts and the other is at 420. Now, what's the law as to whether the plaintiffs here have to take or whether the court in assessing NEPA has to take that government expert position kind of on its face value? Let's say the plaintiffs thought, well, really the odds of an accident are one in 100,000 rather than one in a million and the odds of a detonation are like, you know, one out of five accidents. So how could any of that be assessed? Is the answer, well, what is the answer? The case law, the binding case law in this circuit holds that the Navy is entitled to rely on its own expert opinion. And, again, there was no other evidence presented to the Navy or presented in this case. In which case law? What case is that? I've cited in the record. Okay, that's right. If it's in your brief, don't worry about it. But I've cited a case or two for the proposition that the Navy is entitled to rely on its own expert opinion. Let me ask another question. And I'm assuming, but I don't know if it's true, but I'm assuming if the President says the base is going to be on Wood Canal for these particular subs, that the Navy could not as a practical matter say, although we're going to keep the subs there when they're not out at sea, anytime we have to take a missile off or put one on for maintenance or for whatever reason, we're going to run the ship down to San Diego and do it there instead of doing it on Wood Canal. The Navy doesn't have that discretion. Like the base, really, if that's where the base is, that's where certain operations have to be. That's right. That's exactly correct. Does the record make that clear? Well, it's, again, as I started out saying, I wish I had an affidavit that said precisely that, that what basing the Trident Missile System at Bangor means is that you have to load and unload. But today is really the first time that was questioned. And are there, is a base for this type of sub different than just any old submarine base? Oh, yeah. So, like, where's the, does the record tell us if you wanted to take one of the Trident subs out for a ride and you couldn't bring it back to Wood Canal, where can it go to park? Well, it can park in a sub base, but the missiles can only be serviced at Kings Bay, Georgia or Bangor because of PDD-30. And that's it? Just those two places? Just those two places. One for the Atlantic Fleet and one for the Pacific Fleet. That's what the President ordered with PDD-30. And we know that's not classified? That's not, that fact is not classified. But the two- Well, I mean, obviously you're saying it. But I'm just trying, see, I'm kind of trying to understand what we can know and what we can't know. Right, right. So you're saying that- So I'd refer the court to understand sort of what the missile system encompasses. There's an affidavit that's at page 10 of the TAN excerpt. There's the final master plan for the base. Page 155 is particularly helpful. I think it explains that the missile system is encompassed by the missiles, the subs, and the landward facilities. And then the concern about Trident case is also pretty helpful for describing how the missiles need to be serviced at this location. What if we were to say that this case kind of falls somewhere between, you know, presidential decision, which can't be challenged, and that there was some narrow aspect of the Navy's conduct that could be challenged? Then you would say, but no EIS is required or NEPA analysis because it is so remote, potential impact. What other cases do we look at where they said this remoteness basically gives you a free zone? There's two cases with which I'm quite sure the court is very familiar. The Warm Springs case and the No Gwen case are very helpful in this. And in No Gwen in particular, the court, Judge Renee, in fact, quoted the Warm Springs, where the court said everyone recognizes the catastrophic results of the failure of the dam. To detail those results would serve no useful purpose. On Monday, the Supreme Court, in effect, adopted that analysis and said that analyzing the impacts in a situation like this where the agency doesn't have control over the ultimate decision doesn't serve the purposes of NEPA because the agency can't change its decision. Even the public knowledge aspect in NEPA, the idea of fully informing the public, ties back into the agency's decision-making function. And so the Supreme Court on Monday said in a situation like this, it doesn't serve any purpose to fully inform the public. So No Gwen and Warm Springs are quite helpful on this. In No Gwen, the court said that an agency need not analyze any conceivable environmental impact of its actions. Here, even if it's conceivable, and, yes, the Navy can conceive of the worst case, the Navy need not analyze it. The Navy plans to analyze it. Does the public record tell us that the only places where the missiles can be serviced are Houston, Aller, Georgia? Yes. I mean, PDD 30 says that directly. That's where the president ordered. I thought that was classified. That was classified. In terms of what the plaintiffs could know, does the record, public part, do public parts of the record make it clear that the missiles could only be serviced in Georgia or what can happen? Yes, the parts of the record I was just referring to a moment ago. So ER-10-155, the final master plan, the EIS. You know, I think probably the executive summary of the EIS would be most helpful, and I can't recall if we put that in the excerpts or not. But it explains, you know, it outlines the D-5 program, and it explains that these are the two locations where the D-5 missiles are. This discussion troubles me because it almost sounds like we're being asked to micromanage the system. In other words, I thought we were dead in the water on a D-5 system. In other words, once the president says install, whether that means unloading it, rotating it, painting it, kissing it, I don't know. That's what they do. But counsel is saying, as I understand what he's saying, fine, you do that, but you must do under NEPA an EIS in case something goes wrong. You say no, no problem because of the odds. And he said, and coming from Nevada, I understand it. He said the mere fact that you assess it, you've got to do it. So I think we've got to concentrate on one of those places. Concentrating on micromanaging, who does it, where to do it, I thought that was out of the picture. It's just a question. He's saying if you do it and you say it might happen, you've got to analyze it from a NEPA standpoint and an environmental standpoint. I think that PDD-30 is a slam dunk here. I think that if you turn to the big Mexican truck case from London, again, the agency there did have some discretion over the program, but the court held that it didn't need to do the NEPA analysis. I think that case is on all fours here, and it determines this case. The alternative, the uncontradicted evidence is that the risk here is minuscule. And just because the Navy can plan the worst-case scenario, just because the Navy has this incredible capacity to determine down to the extent of a negative 19, whatever the risk of an explosion, doesn't mean that the Navy takes on that responsibility of analysis under NEPA. Of course the Navy plans for the worst case. The Navy plans for the possibility of a nuclear war, but they don't have to analyze the impacts of a nuclear war under NEPA. And just because they plan for the worst possible scenario doesn't mean that you have to do a worst-case analysis. This law is quite to the contrary. Do we need to get into classified information like this PDD in order to understand your argument that the case is on all fours or the case is controlled by this public citizen case in the sense that the Navy's discretion is constrained? Or can we assess that based on what's in the record that the public could also assess? I think you can do it based on what we have publicly represented in the brief to be the non-classified aspects of PDD 30. In the brief we said that the President determined in PDD 30 that the D-5 missile system must be cited at Bangor. I think that is sufficient. The Court need not see the document. But is there evidence in the record of that apart from your representation in your brief? Is there, like, non-classified evidence of that directive? Yes. There's two affidavits that discuss what PDD 30 says. And, you know, one of them is focused on the fact that PDD 30 ratcheted down the back-fit program. We were talking about this on the direct argument that the back-fit program for the D-5 was originally meant to be some $150 million. But following the START treaties, it was ratcheted back to about a third of the size. So one of the affidavits is focused on that. The other affidavit is more focused on the fact that PDD 30 ordered the D-5 back-fit program to go forward at Bangor. And so following that directive, the Navy has to do this at Bangor. They have no discretion about whether or not to have the missile at Bangor until they rebuttal to missile at Bangor. Thank you. Your time has expired, and we'll hear rebuttal then from Ground Zero. Thank you, Robert. We'll take one more minute before we go to the public. Actually, I hope you do go to PDD 30. I mean, the public thought you should, but AFNI has important decisions, and I hope you do look at PDD 30 and decide whether or not to do so. We have not been able to and won't be able to, and we recognize that. But it got very much to PDD 30. It says anything about that these missiles must be serviced, and they must be serviced through and on at and from sub-base Bangor. And it has to be loaded and unloaded at sub-base Bangor. So you want us to go to the management of Bangor? No, I don't want you to go to the management. That is the job of the Navy. Well, but if loading and unloading is the risk, as you've identified it, and if they've negated the risk by mathematics, and if we can't use that, the only way we can do it is to go into the operational unloading board. That means we go into the directive and say, gee, we don't think you ought to do it in the spring because that's when the salmon are there. I have a problem with that. That's the Navy's job, though. No, I'm not asking you to recommend to the Navy. The Navy needs to document it for itself. Oh, you're saying that they should analyze the spring unloading, fall unloading, et cetera. That's what NECA does. Yeah, but we've got to tell them to do it. See, that's the problem. You've got to tell them to do the environmental analysis. You're not telling them to do it. No, we've got to tell them that it's important that they analyze loading and unloading in the spring. And that sounds like it's managing something. That is the Navy's only directive that says provide maximum protection for canned fish. You well know from the November decision. Okay. The key on those cases was there's nothing to conserve. There's nothing to maintain. Here is something we can mediate. And it does have a structural obligation. But the Navy needs to document the environmental impacts of the same accident, not just draw a line on the map and move it to building site. Thank you. The case of Ground Zero versus Department of the Navy is submitted. And that will conclude our arguments for this morning. Thank you, both counsel. All rise. Thank you. Thank you.
judges: Brunetti, McKeown, Gould